# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

June 8, 2023

Lyle W. Cayce
Clerk

————

No. 21-20323

————

In the Matter of:  Chesapeake Energy Corporation

*Debtor*,

RDNJ Trowbridge; Robert Dunlap; Wendy Dunlap,

*Appellants*,

*versus*

Chesapeake Energy Corporation, James L. Brown; Alice R. Brown; Suessenbach Family Limited Partnership; James S. Suessenbach; Gina M. Suessenbach; MEC Class Plaintiffs,

*Appellees*,

———————————————————

Pennsylvania Proof of Claim Lessors,

*Appellant*,

*versus*

Chesapeake Energy Corporation, James L. Brown; Alice R. Brown; Suessenbach Family Limited Partnership; James S. Suessenbach; Gina M. Suessenbach; MEC Class Plaintiffs,

No. 21-20323
cons. w/ No. 21-20456

*Appellees*,

Consolidated with

_____

No. 21-20456

_____

In the Matter of: Chesapeake Energy Corporation

*Debtor*,

Lillian Sarnosky; Charlene Walters, on behalf of Lyman Walters Family L.P.,

*Appellants*,

*versus*

Chesapeake Energy Corporation, James L. Brown; Alice R. Brown; Suessenbach Family Limited Partnership; James S. Suessenbach; Gina M. Suessenbach; MEC Class Plaintiffs,

*Appellees*.

_____

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:21-CV-1215 c/w 4:21-CV-1218

_____

No. 21-20323
cons. w/ No. 21-20456

Before JONES, HO, and WILSON, *Circuit Judges*.

EDITH H. JONES, *Circuit Judge*:

On emerging from Chapter 11 reorganization effective February 9, 2021, Chesapeake Energy Corporation tested the limits of the bankruptcy court's post-confirmation jurisdiction by asking it to settle two pre-bankruptcy purported class actions covering approximately 23,000 Pennsylvania oil and gas leases. The hitch is this: no proofs of claim were filed for class members, and every feature of the settlements conflicts with Chesapeake's Plan and Disclosure Statement. Handling these forward-looking cases within the bankruptcy court, predicated on 28 U.S.C. § 1334(a) or (b), rather than in the court where they originated, exceeds federal bankruptcy post-confirmation jurisdiction.[1] We VACATE and REMAND the bankruptcy and district court judgments with instructions to dismiss.

## I. Background

To understand the basis for our conclusion, it is necessary to review carefully the claims litigated by the two classes (and the Pennsylvania Attorney General) prior to Chesapeake's Chapter 11 filing; the treatment of the claims by the debtor's Plan and Disclosure Statement; and the post-Effective Date Settlements presented to the bankruptcy and district courts.

The Marcellus Shale formation, which underlies much of Pennsylvania, is one of our country's largest shale gas fields. Chesapeake is a principal leaseholder in the Marcellus Shale play.[2] Chesapeake pays

---

[1] Pennsylvania's Attorney General also filed suit on related charges, but as will be seen, that suit proceeded and was settled according to usual bankruptcy procedures and provides substantial benefits to landowners.

[2] Chesapeake Energy Corp. engages in energy exploration and development, and drills for oil and gas throughout the U.S. It is headquartered in Oklahoma. Chesapeake's subsidiary, Chesapeake Appalachia, LLC, holds Chesapeake's Pennsylvania lease interests, which are in part the subject of the underlying dispute. Chesapeake and its related entities each filed Chapter 11 petitions, and the cases were consolidated by the

No. 21-20323
cons. w/ No. 21-20456

royalties to lessors in exchange for the right to explore for and extract shale gas. The leases are real property interests under state law.

In 2013 and 2014, Pennsylvania lessors sued Chesapeake in federal court for underpaying royalties. In 2015, the Pennsylvania Attorney General sued Chesapeake on similar grounds in state court.

*A. The Demchak Litigation*

The first lawsuit filed was *Demchak Partners Ltd., et al., v. Chesapeake Appalachia, LLC*, No. 13-2289 (M.D. Pa. 2013). The plaintiffs sued in the Middle District of Pennsylvania on behalf of a putative class of thousands of oil-and-gas lessors whose leases contained a "Market Enhancement Clause" (MEC). The MECs prohibited Chesapeake from deducting from the lessors' royalties any postproduction costs incurred to transform extracted gas into a marketable form. The complaint alleged that Chesapeake had failed to honor this clause for several years.

Before the lawsuit was filed, the *Demchak* plaintiffs and Chesapeake preliminarily reached a class-wide settlement agreement (later amended) that would have provided class members with approximately $17 million, and would have modified the terms of the MECs in the class members' leases by obliging Chesapeake to "bear 34 percent of future post-production costs." The district court preliminarily approved the proposed amended class settlement on September 30, 2015. Notice of the proposed settlement was sent to putative class members. But thousands of class members, about 20% of the class, opted out. Chesapeake petitioned for Chapter 11 relief before the Pennsylvania court approved the settlement.

_____

bankruptcy court. Chesapeake Energy Corp. and its relevant subsidiaries are collectively referred to as "Chesapeake."

No. 21-20323
cons. w/ No. 21-20456

### B. The Brown-Suessenbach Litigation

In 2014, Chesapeake was sued twice in the Middle District of Pennsylvania on behalf of a putative class of several thousand other Pennsylvania oil-and-gas lessors whose leases did not include an MEC (the non-MEC suits). *See Brown v. Access Midstream Partners, LP*, No. 14-591 (M.D. Pa. 2014); *Suessenbach v. Access Midstream Partners, LP*, No. 14-1197 (M.D. Pa. 2014). Both sets of plaintiffs alleged, *inter alia*, that Chesapeake improperly inflated post-production costs before deducting them, resulting in royalty underpayments.

*Brown* and *Suessenbach* were consolidated, and the *Brown-Suessenbach* plaintiffs reached a preliminary settlement agreement with Chesapeake that would have provided class members with $7.75 million and modified the leases by affording a lessor's option to choose between two formulas for future calculation of royalties. Before preliminary approval of class action status or the settlement was granted, Chesapeake petitioned for Chapter 11 relief.

### C. The Attorney General Litigation

Pennsylvania's Attorney General (PAAG) sued Chesapeake in Pennsylvania state court in 2015. The PAAG alleged that Chesapeake violated Pennsylvania law in a variety of ways in its dealings with lessors, by inflating prices, engaging in unfair leasing practices and improper deductions, and making an undisclosed market allocation agreement. The parties' litigation was pending at the Pennsylvania Supreme Court when Chesapeake filed for bankruptcy. The automatic stay was lifted to allow the state Supreme Court to rule. Ultimately, the PAAG filed a proof of claim during the pendency of Chesapeake's bankruptcy and settled with Chesapeake before the Plan's Effective Date, as discussed below.

No. 21-20323
cons. w/ No. 21-20456

*D. The Reorganization Proceedings, Plan, and Disclosure Statement*

On June 28, 2020, pressed by ongoing low gas prices compounded by the COVID pandemic's market disruption, Chesapeake filed for Chapter 11 reorganization in the Southern District of Texas. The Pennsylvania cases described above were automatically stayed. *See* 11 U.S.C. § 362(a)(1). The bankruptcy court set a Claims Bar Date of October 30, 2020, for filing proofs of claim that arose before the petition date. The Bar Date Order warns that unfiled or untimely Proofs of Claim will result in discharge of the claimant's debt and the claimant will be "forever barred, estopped, and enjoined from asserting such claim . . . ."

None of the named plaintiffs in the class actions filed proofs of claim, nor did the vast majority of landowners within the putative classes. No proof of claim was filed on behalf of either class.

The PAAG, however, did file a timely proof of claim, as did 161 individual leaseholders within the two putative classes, including appellants.

On January 16, 2021, only seven months after Chesapeake filed for bankruptcy, the bankruptcy court confirmed Chesapeake's Fifth Amended Joint Chapter 11 Plan of Reorganization ("the Plan"). The Plan must be read in conjunction with the debtor's Disclosure Statement. In pertinent part, the Disclosure Statement explained the scope and treatment of Chesapeake's creditor classes; the "material litigation" and "litigation risks" surrounding, *inter alia*, the Pennsylvania cases; and the consequences of late-filed claims against the debtor.

At the date of Chesapeake's bankruptcy, the claims of the Pennsylvania landowners consisted of (a) monetary damages owed for underpaid royalties and (b) discontent with the methods by which Chesapeake calculated ongoing royalties under the MEC and non-MEC leases. The Disclosure Statement provided that the landowners' liquidated

royalty claims were to be added to a class of other general unsecured claims. According to the Disclosure Statement, holders of Allowed Proofs of Claim within this class were estimated to receive 0.1% of the amounts Chesapeake owed them. Chesapeake reemphasized this treatment of the royalty claims in a discussion titled, "Preservation of Royalty and Working Interests." According to that paragraph, "[f]or the avoidance of doubt," any prepetition or pre-Effective Date right to a royalty payment "shall be treated as a Claim under the Plan and shall be subject to any discharge" without prejudice to post-Effective Date royalty right disputes or claims.

Significantly, the Plan, reinforced by these Disclosure Statement Provisions, assured Chesapeake's creditors that the Pennsylvania leases "shall remain in full force and effect in accordance with the terms of the granting instruments or other governing documents . . . [and] no Royalty . . . Interests shall be compromised or discharged by the Plan . . . ."

The Plan rejected the pending prepetition *Demchak* and *Brown-Suessenbach* settlement agreements. At the same time, the Disclosure Statement identified and described all three Pennsylvania cases as "Pending Material Litigation," in which the debtors "dispute liability . . . and intend to vigorously defend . . . ." Later on, the Disclosure Statement characterized all such pending material litigation as among the "risk factors" following Plan confirmation. While acknowledging the uncertainty of litigation outcomes, the debtor also believed "substantially all pending prepetition litigation will result in General Unsecured Claims, which will be treated in accordance with the Plan and discharged thereunder."

The Plan also stated that "any and all Proofs of Claim Filed after the Claims Bar Date shall be deemed disallowed and expunged as of the Effective Date," "[e]xcept . . . as agreed to by the Reorganized Debtors" or "unless

such late Proof of Claim has been deemed timely Filed by a Final Order or otherwise allowed by order of the Bankruptcy Court."

The Plan's Effective Date was February 9, 2021, that is, the defined date on which the Plan was "consummated." The confirmation order became final without appeal.

Even though the Plan authorized late filing of proofs of claim, none were filed by or on behalf of the class plaintiffs or class members. Therefore, only the PAAG and the 161 individual leaseholders who filed timely Proofs of Claim were eligible to vote or receive any distributions on account of their money damage claims. 11 U.S.C. § 1126(a). The leases rode through the bankruptcy unimpaired.

In sum, those creditors who studied the Disclosure Statement—especially filers of timely Proofs of Claim whose favorable votes on the Plan were being solicited—would have concluded that Chesapeake (1) owed little or nothing on the Pennsylvania royalty owners' class actions because they did not file timely Proofs of Claim or because their claims, if timely, would fall in the general unsecured class; and (2) kept the Pennsylvania lease agreements with their MEC or non-MEC royalty formulas intact.

*E. The Settlements*

On the Effective Date, the PAAG settled with Chesapeake. Several features of the settlement are noteworthy. First, because the PAAG timely filed its claim, it preserved the ability to settle prepetition royalties for $5.3 million on behalf of participating leaseholders. Second, MEC leaseholders were given an option to have future royalties paid based on the higher of the in-basin index price or a netback price. Those with non-MEC leases could choose either the in-basin index price or a netback price for future royalties. Third, leaseholders could decide whether to opt in to the settlement or to retain their original bargained-for lease terms and claims for underpaid

royalties.   This settlement did not release private claims.  This settlement was approved by the bankruptcy court as part of the usual claims adjudication process and is final.

A month *after* the Effective Date, however, Chesapeake also reached "settlement agreements" with both the *Demchak* (MEC) and *Brown-Suessenbach* (non-MEC) plaintiffs.  These settlements purportedly resolved all of Chesapeake's remaining Pennsylvania royalty-related litigation and disputes.

The MEC Settlement required Chesapeake to pay $5,000,000 to the class members arising from prepetition royalty claims.  It also altered the future royalty formulas for their leases by allowing MEC class members to choose to have their royalties calculated each month based on the higher of the in-basin index or netback price.[3]  Thus, if Chesapeake transported gas and, after making allowed deductions, received prices higher than the in-basin index price, the landowner would be paid royalties based on the higher price.  The MEC Settlement also prevented Chesapeake from deducting from its royalty obligations gas "used as fuel, lost, or otherwise unaccounted for," limited various deductions for marketing fees and third-party services or operations, and prevented Chesapeake from carrying a negative balance forward from any months in which costs exceed sale prices.  As to the twenty percent of the original *Demchak* class who had opted out several years previously, the MEC settlement was framed to force those landowners back into the class and require them to opt out again.

---

[3] The in-basin price is the average of two oil-and-gas price indexes.  The netback price is the average sales price Chesapeake receives for its "production month sales to third parties minus a proportionate share" of postproduction costs.

No. 21-20323
cons. w/ No. 21-20456

The Non-MEC Settlement required Chesapeake to pay $1.25 million to the class arising from prepetition royalty claims. It also allowed class members to "choose how to have their royalties calculated going forward, using either the in-basin index or netback price," but "they can only make their election once, not each month."

Together, the Pennsylvania, MEC and Non-MEC settlements purportedly resolve the claims of approximately 23,000 Pennsylvania landowners. Under the MEC and non-MEC settlements, Chesapeake is released from liability for all past *and future* claims.

Chesapeake sought preliminary approval of the MEC and non-MEC settlements in the bankruptcy court. Pennsylvania lessors who filed proofs of claim ("Proof of Claim Lessors") opposed Chesapeake's motion. The bankruptcy court ultimately concluded that it had "core" jurisdiction over the settlements pursuant to 28 U.S.C. § 1334(a), and that the settlements were "in the best interests of the Debtors' estates, their creditors, and other parties in interest." *See* Fed. R. Bankr. P. 9019. Consequently, the court overruled the Proof of Claim Lessors' objections, preliminarily approved the settlements, preliminarily certified the settlement classes, and approved the form and manner of class notices. The bankruptcy court also concluded that an Article III court should make the final determinations regarding class certification and settlement approval.

On appeal, the district court affirmed the bankruptcy court's preliminary approval of the settlements. The district court stated that a "similar class settlement was preliminarily approved by the Middle District of Pennsylvania before Chesapeake declared bankruptcy," and that the "record shows that the class settlements are the most practical vehicle for recovery for most of the class members."

No. 21-20323
cons. w/ No. 21-20456

The Proof of Claim Lessors appealed the district court's approval of the settlements to this court and requested a stay. The district court denied a stay, asserting that appellants had "not shown that their appeal [was] likely to be successful," or that "they will be harmed" by preliminary approval given that they could opt-out of the settlement class or reassert their objections at the final confirmation hearing. Two putative class members then objected to the district court's final approval: Lillian Sarnosky (a lessor with an MEC lease provision) and Charlene Walters (a non-MEC lessor).

A final class action fairness hearing occurred on July 27, 2021. A month later, the district court granted final approval to the two class settlements.[4] The district court differed from the bankruptcy court's determination of "core" jurisdiction. It explained instead that jurisdiction existed to adjudicate the settlements because they "relate to" the confirmed Chapter 11 plan. The court also held that the named plaintiffs had standing, that the disputes were not moot, that each of the Federal Rules of Civil Procedure 23(a) and (b) class action factors was satisfied, and that the settlements satisfied the requirements of Rule 23(e) and the factors identified in *Reed v. General Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983). The court rejected a challenge to the settlement notices.[5] Finally, the district court approved the settlements' attorney fee provisions given the reasonableness

---

[4] The district court withdrew the initial final approval order and re-entered the order in October 2021 after correcting certain clerical errors.

[5] The court concluded that "[t]he notice sent to the absent MEC and Non-MEC class members was the best notice practicable under the circumstances, as required under Rule 23(e)(1)," and that the opt-out procedures were "not unduly burdensome," including for those plaintiffs who years prior opted out of the proposed *Demchak* settlement in the Middle District of Pennsylvania.

No. 21-20323
cons. w/ No. 21-20456

of the sums requested by named plaintiffs' counsel for years of (mostly prepetition) work and the challenging issues they addressed.

Sarnosky and Walters appealed every aspect of the final approval order to this court. At their request, this court consolidated the Proof of Claim Lessors' appeal from the preliminary approval order with Sarnosky and Walters' appeal from the final approval order. We have appellate jurisdiction pursuant to 28 U.S.C. § 158(d). We need only discuss whether the bankruptcy and district courts had jurisdiction under 28 U.S.C. § 1334 to hear and decide these "class" claims.

## II. Discussion

The lower courts' subject-matter jurisdiction is reviewed *de novo*. *In re Galaz*, 841 F.3d 316, 321 (5th Cir. 2016); *In re Deepwater Horizon*, 739 F.3d 790, 798 (5th Cir. 2014).

Congress vested district courts with jurisdiction over bankruptcy "(1) 'cases under title 11,' (2) 'proceedings arising under title 11,' (3) proceedings 'arising in' a case under title 11, and (4) proceedings 'related to' a case under title 11." *In re U.S. Brass Corp.*, 301 F.3d 296, 303 (5th Cir. 2002) (citing 28 U.S.C. § 1334(a)–(b)). "The first category refers to the bankruptcy petition itself." *Id.* at 304. The latter three further define the scope of bankruptcy jurisdiction, with "related to" jurisdiction being the broadest category. *Id.* "Related to" jurisdiction exists where "the outcome of the proceeding could conceivably have an effect on the debtor's estate." *In re Craig's Stores of Texas, Inc.*, 266 F.3d 388, 390 (5th Cir. 2001). The district courts routinely delegate authority to bankruptcy judges over bankruptcy cases and "core" proceedings "arising under" and "arising in" Title 11. 28 U.S.C. § 157(a)–(b). Adjudications of prepetition claims against

12

No. 21-20323
cons. w/ No. 21-20456

a debtor's estate are core proceedings. *In re Wood*, 825 F.2d 90, 92 (5th Cir. 1987).

Following the confirmation of a Chapter 11 reorganization plan, bankruptcy jurisdiction is limited to matters "pertaining to the implementation or execution of the plan." *Craig's Stores*, 266 F.3d at 390. For instance, a reorganized debtor often must resolve, post-confirmation, the amounts owed on proofs of claim, administrative claims, preference and fraudulent transfer claims, and attorneys' fees, all of which fall within "core" bankruptcy jurisdiction. *See generally* 28 U.S.C. § 157(b). Within its core jurisdiction, the court may also be called upon to interpret the terms of a confirmed reorganization plan. *In re U.S. Brass*, 301 F.3d at 306. But generally, after "a debtor's reorganization plan has been confirmed ... bankruptcy jurisdiction[] ceases to exist." *Craig's Stores*, 266 F.3d at 390. "Once the bankruptcy court confirms a plan of reorganization, the debtor may go about its business without further supervision or approval." *Id.* (quoting *Pettibone Corp. v. Easley*, 935 F.2d 120, 122 (7th Cir. 1991)).

Chesapeake, seconded by each class, contends initially that the two class action settlements fall within the bankruptcy and district courts' "core" claims-handling jurisdiction because they resolved the leaseholders' suits for past royalties, money damages and royalty interpretation issues. Alternatively, Chesapeake relies on the "narrower," "more exacting" standard for post-confirmation jurisdiction, as found by the district court. *In re U.S. Brass Corp.,* 301 F.3d at 304–05.

### A. Core Bankruptcy Jurisdiction

We reject the first contention. These settlements are not within ordinary claims adjudication. Prior to bankruptcy, only the MEC Class had

13

No. 21-20323
cons. w/ No. 21-20456

been preliminarily certified, yet no class proof of claim was filed on its behalf.[6] Thousands of leaseholders who were potential class members never filed proofs of claim, nor did Chesapeake file a proof of claim of any sort referencing the Pennsylvania royalty claims.    *See* 11 U.S.C. § 501(c). Chesapeake's Plan emphatically holds that "Proofs of Claim Filed after the Claims Bar Date shall be deemed disallowed and expunged as of the Effective Date."    The debtor points out that the provision bars late filed claims "*[except]* . . . as agreed to by the Reorganized Debtors" or "*unless* such late Proof of Claim has been deemed timely Filed by a Final Order or otherwise allowed by order of the Bankruptcy Court."  But because no such late Proofs of Claim have ever been filed, they cannot have been "deemed timely Filed." And in any event, neither of the courts below so held.

This reading of the Plan—that the class members' unfiled claims merit no post-confirmation recovery—is not a semantic quibble tacitly overcome by the lower courts' settlement approvals.  It is important to note that even the district court repeatedly acknowledged that for class members who filed no proofs of claim, "the bankruptcy extinguished their prepetition royalty valuation claims against Chesapeake."  The court cited 11 U.S.C. § 524(a) and *Matter of Edgeworth*, 993 F.2d 51, 53 (5th Cir. 1993) ("A discharge in bankruptcy . . . releases the debtor from personal liability for the debt").  The district court was correct.  Moreover, Chesapeake's counsel confirmed the effect of the Plan as he rebuffed a group of Pennsylvania leaseholders who sought, post-confirmation, to enforce prepetition royalty claims against the debtor.  Counsel admonished them that because the claims

---

[6] This court has yet to take a position on whether a class proof of claim is available consistent with the Bankruptcy Code and Rules.  *See Teta v. Chow*, 712 F.3d 886, 892 (5th Cir. 2013).  Thus, we assume arguendo but do not decide that such a claim could have been filed.

had not been timely filed, "such claims . . . were discharged and there is nothing further to pursue in any forum after the Plan Effective Date." The lower courts were not empowered to revive never-filed, discharged claims as if they were engaged in a "core" claims adjudication proceeding.

Moreover, treating the class actions as if there had been timely filed proofs of claim disregards the reorganization process. The requirement to file proofs of claim is more than a technicality in Chapter 11. Proofs of claim are the touchstone for plan approval and proper distribution of the debtor's assets allotted to each creditor class. Only holders of "allowed" filed claims are entitled to vote on the plan. 11 U.S.C. §§ 1126(a), 502(a), 501(a). The universe of such claims determines the constituency for required majority votes in each voting class. Further, as Chesapeake's Disclosure Statement promised,[7] and the debtor admits in its brief, the debtor "must treat all of its unsecured creditors comparably . . . ." In this case, the Pennsylvania leaseholders' royalty claims were classified as general unsecured claims by the Plan and Disclosure Statement. The Disclosure Statement roughly estimated that those claims might be paid 0.1% of the prepetition amount. Yet under the class settlements (excluding the separate fund contained in the PAAG settlement), the Leaseholders could obtain well over twenty percent of the amounts they negotiated in the prepetition Pennsylvania federal court suits. We cannot know how the vote to approve the Plan would have turned out had the Pennsylvania leaseholders filed general unsecured claims. But the enormous recovery windfall Chesapeake is now willing to pay the class

---

[7] The Disclosure Statement states that "[e]ach holder of an Allowed Claim will receive the same treatment as other holders of Allowed Claims in its Applicable Class . . . ." Even if this statement is construed broadly, the different "treatment" proposed here between Pennsylvania royalty owners who never filed Proofs of Claim and other members of the general unsecured class is eye-popping and unsupportable.

members compared with other general unsecured creditors belies equal treatment within this creditor class. Whether intentionally or unintentionally, Chesapeake's unorthodox approach to revising its relationships with thousands of Pennsylvania royalty owners thwarted the transparency of the reorganization process.

Chesapeake's additional argument for "core" jurisdiction also does not withstand scrutiny. It contends that because 161 leaseholders did file timely Proofs of Claim, its class settlements could be approved by the courts within bankruptcy "core" jurisdiction. This audacious attempt to bootstrap a few *objectors'* preserved rights into a basis for a "fundamental reset" between the debtor and nearly 23,000 other Pennsylvania lessors who did not preserve their rights will not fly.

### B. Related-to Jurisdiction

The applicability of "related to jurisdiction" in this post-confirmation setting presents a closer question. In *Craig's Stores*, this court considered conflicting rulings in the courts of appeals and articulated standards for post-confirmation bankruptcy jurisdiction. Those have since been regularly applied in this circuit to determine when a reorganized debtor can no longer "come running to the bankruptcy judge every time something unpleasant happens." *Pettibone Corp. v. Easley*, 935 F.2d 120, 122 (7th Cir. 1991). While some cases can be decided without them, the three *Craig's Stores* factors are a "useful heuristic" for determining whether a matter concerns the effectuation of the plan. *In re GenOn Mid-Atl. Dev., L.L.C.*, 42 F.4th 523, 534 (5th Cir. 2022). First, do the claims at issue "principally deal[] with post-confirmation relations between the parties?" *Craig's Stores*, 266 F.3d at 391. Second, was there "antagonism or [a] claim pending between the parties as of the date of the reorganization?" *Id.* Third, are there any "facts or law deriving from the reorganization or the plan necessary to the claim?" *Id.*; *see*

No. 21-20323
cons. w/ No. 21-20456

*also In re Enron Corp. Sec.*, 535 F.3d 325, 335–36 (5th Cir. 2008) (applying the factors). We consider each query in turn.

*1. Principally Dealing with Post-Confirmation Relations*

Chesapeake contends, and the MEC class and non-MEC class plaintiffs agree, that because the settlements predate bankruptcy, they do not "principally deal" with Chesapeake's post-confirmation business.[8] They rely on the district court's characterization of the settlements.

This argument is wholly unpersuasive. It ignores that the debtor's reorganization plan discharged the non-filing leaseholders' pre-confirmation monetary claims against Chesapeake while leaving their leases absolutely intact. The Plan permitted late-filed claims, but none were filed. The Plan stated that all claims not preserved and disposed of by the Effective Date

---

[8] Although the appellees recast the district court's analysis in terms of the *Craig's Stores* test, the district court applied somewhat different factors. First developed in the bankruptcy courts, the district court's approach is an attempt to summarize the considerations present in *Craig's Stores* and *In re U.S. Brass Corp.* It makes use of six factors:

> (1) when the claim at issue arose; (2) what provisions in the confirmed plan exist for resolving disputes and whether there are provisions in the plan retaining jurisdiction for trying these suits; (3) whether the plan has been substantially consummated; (4) the nature of the parties involved; (5) whether state law or bankruptcy law applies; and (6) indices of forum shopping.

*See, e.g.*, *In re Encompass Servs. Corp.*, 337 B.R. 864, 873 (Bankr. S.D. Tex. 2006), *aff'd*, 2006 WL 1207743 (S.D. Tex. May 3, 2006).

We see no reason to reframe our precedent in this manner. The co-existence of two tests stands to confuse lower courts and create needless additional work for the parties to bankruptcy. The *Craig's Stores* factors are firmly rooted in precedent, whereas the other test has never been used or even mentioned by the Fifth Circuit. Moreover, *In re Brass Corp.* did not purport to introduce new factors to or otherwise modify the *Craig's Stores* test; it applied it. 301 F.3d at 305 (concluding that "the Appellants' motion pertains to the plan's implementation or execution and therefore satisfies the *Craig's Stores* test"). Therefore, no other standard is necessary.

were discharged.  For example, Article VIII, Section A of the Plan, labeled "Discharge of Claims and Termination of Interests," provides:

> The Confirmation Order shall be a judicial determination of the discharge of all Claims (other than the Reinstated Claims) and Interests (other than the Intercompany Interests that are Reinstated) subject to the occurrence of the Effective Date.

Further, Article III, Section D of the Plan, labeled "Releases of Holders of Claims and Interests," provides:

> [O]n and after the Effective Date . . . each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each Releasing Party from any and all Causes of Action.

These releases also bar all creditors from seeking post-confirmation judgments against Chesapeake.  And if these provisions were not explicit enough, the Plan rejected each of the pre-bankruptcy settlements that had been effected in the Pennsylvania federal court.

Consequently, the vast majority of claimants in the *Demchak* and *Brown-Suessenbach* suits, unlike those few lessors who timely filed proofs of claim, have no recourse in bankruptcy court for their prepetition monetary claims.  *See generally* 11 U.S.C. § 1141(d) (with no relevant exceptions, the confirmation of a plan discharges the debtor from any claims that arose pre-confirmation).  As to the non-filers, Chesapeake's pre-Effective Date debts for deficient or improperly calculated royalties were discharged and "expunged"; the claimants cannot resurrect them, use them to invoke bankruptcy jurisdiction, and then lay them to rest via class settlements.

Reinforcing this conclusion is the fact that, contrary to the Plan, the settlement agreements mandatorily modify the terms of the leases *going forward* for all the class members, even those who originally opted out of the *Demchak* settlement.  Chesapeake estimates that the new terms will yield the

class members millions more in royalties in future years, but the settlements also bar *future claims* by any class members.  Yet the reorganization Plan stated that the leases would ride through the reorganization unaffected.

Another curious but purely forward-looking feature of the class settlements is their interrelation with the PAAG settlement, which occurred after it filed a timely proof of claim.  The MEC and non-MEC classes both extol the symbiotic settlement gains.  Notably, the PAAG received a multimillion-dollar settlement fund that can be disbursed to leaseholders; and the PAAG settlement offers similar lease modifications to those in the class settlements.  But the PAAG settlement, unlike the class settlements, offers the leaseholders the option to revise their future royalty treatment, whereas the class settlements are mandatory.  Pre-bankruptcy, these parties were not tied together as they are now.  Accordingly, the first *Craig's Stores* factor weighs against jurisdiction.

*2. Antagonism or Claims Pending at the Date of Reorganization*

Chesapeake points out that the "antagonism" between the parties predated the plan's confirmation.  That is correct, but the lessors' class actions against Chesapeake did not survive confirmation.  Post-confirmation, the class members could no longer pursue their discharged claims, and the Plan by its express terms did not adversely affect or modify their prepetition royalty provisions.   As a result, this *Craig's Store* factor does not pull the class settlement agreements within the scope of bankruptcy's "related-to" jurisdiction.

*3. Facts or Law Deriving from the Reorganization Necessary to the Claim*

The third factor also works against the class plaintiffs.  Nothing in Chesapeake's reorganization plan is necessary to the disposition of the class action claims or the settlement agreements.  Those agreements have "nothing to do with any obligation created by the debtor's reorganization

No. 21-20323
cons. w/ No. 21-20456

plan." *Craig's Stores*, 266 F.3d at 391.  Nor does Chesapeake assert, as Craig's Stores attempted to claim, that modifying the status of the Pennsylvania leases going forward will affect its distribution to creditors under the Plan.  *Id.*  Quite the opposite: the settlements contradict the plan. Whereas the plan discharged debts unless a timely proof of claim was filed, the settlements require Chesapeake to pay the non-filing lessors a portion of their royalty claims far higher than other creditors' timely filed general unsecured claims.  Whereas the plan assumed that Chesapeake's leases would ride through bankruptcy unaffected, the settlement requires a mandatory alteration in the terms of thousands of Pennsylvania leases.  Far from merely enforcing the plan, the settlement accomplished a self-described "fundamental reset of Chesapeake's relationship with its Pennsylvania lessors."  The effect of this reset on Chesapeake's creditors concerns the future, not the consummated reorganization.

Thus, the approval of the settlements did not pertain "to the implementation or execution of the plan."  *Craig's Stores*, 266 F.3d at 390.  It would make little sense to hold that post-confirmation bankruptcy jurisdiction extends to these agreements, given that they are voluntary arrangements paying off claims that were already discharged by the bankruptcy.  This is especially so because the terms of the confirmed Chapter 11 reorganization plan barred the two forms of relief that the agreements purport to grant: additional monetary relief and modification of the leases.[9]

## III. Conclusion

For these reasons, the bankruptcy and district courts lacked jurisdiction to approve these two post-Effective Date settlements.  Whatever

---

[9] This court's decision in *In re Enron Corp. Sec.*, 535 F.3d 325, 335 (5th Cir. 2008), is not apposite.  That case held that lawsuits removed to the bankruptcy court during

No. 21-20323
cons. w/ No. 21-20456

claims may have accrued to Pennsylvania leaseholders after the Effective Date of Chesapeake's Plan are the only claims for which there is now a remedy,[10] but such post-confirmation claims are unrelated to the bankruptcy.

Accordingly, the bankruptcy and district court judgments are VACATED, and the settlement proceedings are remanded with instructions to DISMISS for lack of jurisdiction.

---

Enron's reorganization remained within the court's jurisdiction post-confirmation. Here, the lawsuits were never removed, just stayed pursuant to 11 U.S.C. § 362(a)(1).

[10] Such post-confirmation claims may well have been diminished by the PAAG settlement. Chesapeake asserts it has been offering leaseholders the new royalty payment terms since February 2021 pursuant to the PAAG settlement.